# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **LINDA MARQUARD and DAVID MARQUARD**, | Case No. 3:17-cv-549-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **NEW PENN FINANCIAL, LLC, dba SHELLPOINT MORTGAGE SERVICING, and THE BANK OF NEW YORK MELLON fka THE BANK OF NEW YORK, as TRUSTEE FOR THE CERTIFICATEHOLDERS of CWABS INC., ASSET-BACKED CERTIFICATES, SERIES 2007-3**, | |
| Defendants. | |

David L. Koen, LEGAL AID SERVICES OF OREGON, 520 SW Sixth Avenue, Suite 700, Portland, OR 97204; Emily Teplin Fox and Ed Johnson, OREGON LAW CENTER, 522 SW Fifth Avenue, Suite 812, Portland, OR 97204. Of Attorneys for Plaintiffs.

Donald G. Grant, DONALD G. GRANT, P.S., Washougal Town Square, Suite 245, 1700 Main Street, Washougal, WA 98671; Neeru Jindal, YU MOHANDESI LLP, 633 West Fifth Street, Suite 2800, Los Angeles, CA 90017. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs Linda Marquard ("Ms. Marquard") and David Marquard ("Mr. Marquard") (collectively, "the Marquards" or "Plaintiffs") bring this lawsuit against Defendants New Penn Financial, LLC, dba Shellpoint Mortgage Servicing ("Shellpoint") and the Bank of New York Mellon, fka the Bank of New York (the "Bank") (collectively, "Defendants"). The Marquards allege that Defendants collected escrow payments for property taxes that the Marquards did not owe because of a state deferral program. The Marquards assert claims alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), breach of contract, breach of the covenant of good faith and fair dealing, violation of the Unlawful Trade Practices Act, conversion, violation of Oregon Revised Statutes ("ORS") § 659A.142, violation of the Fair Housing Amendments Act ("FHA"),[1] violation of ORS § 659A.145, declaratory judgment, and contract reformation. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants move to dismiss the Marquard's claims of conversion, violation of ORS § 659A.142, violation of the FHA, violation of ORS § 659A.145, declaratory judgment, and contract reformation. For the reasons stated below, Defendants' motion is granted in part and denied in part.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint

---

[1] Plaintiffs allege violations of the Fair Housing Amendments Act, which amended the Fair Housing Act. Most case law references the Fair Housing Act. Thus, for convenience, the Court references Plaintiff's claims as "FHA" claims.

and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## BACKGROUND

In 2005, Ms. Marquard purchased a home in Portland, Oregon. First Amended Complaint ("FAC") ¶ 15 (ECF 39). In 2007, the Marquards refinanced their home with the loan that is at issue in this lawsuit, and Mr. Marquard was added to the title. FAC ¶ 16. In February 2011, Ms. Marquard was laid off from her job as an associate director of strategic planning for an energy conservation non-profit organization. FAC ¶ 21. Later in 2011, the Marquards became unable to make payments on their home loan. FAC ¶ 22.

Mr. Marquard has two ruptured discs in his lower back, stemming from prior work, most recently from lifting a concrete fountain at a nursery. FAC ¶ 23. His injury causes him back pain and numbness in his legs. FAC ¶ 24. In 2015, the Social Security Administration found him to be disabled. FAC ¶ 23.

In August 2015, Ms. Marquard began working part-time as a cashier at a Fred Meyer supermarket, earning $10.50 per hour. FAC ¶ 26. In March 2016, Ms. Marquard was diagnosed with non-small cell lung cancer. FAC ¶ 27. She then underwent surgery to remove the upper lobe of her right lung. FAC ¶ 27. In September 2016, Ms. Marquard learned that her cancer had spread, and she was diagnosed with Stage IV non-small cell lung cancer. FAC ¶ 37. On September 29, 2016, Ms. Marquard applied for Social Security Disability Insurance ("SSDI") under the Social Security Administration's expedited Compassionate Allowances Initiative. Her application was approved. FAC ¶ 39. She receives $2,485 per month in SSDI benefits. FAC ¶ 2.

Defendant Shellpoint has been the mortgage servicer for Plaintiffs' home loan since December 1, 2016, when it succeeded Plaintiffs' former servicer, Specialized Loan Servicing LLC ("SLS"). FAC ¶ 49.

For the loan that is at issue in this lawsuit, Plaintiffs entered into their mortgage arrangement on January 26, 2007. The Bank is the Note Holder and Lender. FAC ¶ 19. Paragraph 3 of its Deed of Trust provides:

> Borrower shall pay to Lender . . . a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property . . . . These items are called "Escrow Items." . . . Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.

> Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) **not to exceed the maximum amount a**

> ***lender can require under RESPA***. Lender shall estimate the
> amount of Funds due on the basis of current data and reasonable
> estimates of expenditures of future Escrow Items or otherwise in
> accordance with Applicable Law.

ECF 41-1 at 4 (Deed of Trust ¶ 3) (emphasis added). The Deed of Trust also provides: "If there

is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower

for the excess funds in accordance with RESPA." *Id.* at 4 (Deed of Trust ¶ 3).

In June 2016, the Oregon Department of Revenue ("DOR") approved Plaintiffs'

application for the Oregon Property Tax Deferral for Disabled and Senior Citizens program ("the

"Oregon Tax Deferral Program" or "the Program"). FAC ¶ 31. The purpose of the Program is to

keep low-income senior citizens and people with disabilities in their homes by relieving them of

having to pay property taxes while they are incapable of making such payments. FAC ¶ 161.

Under the Program, the State of Oregon agreed to pay Plaintiffs' property taxes to Multnomah

County on an annual basis, beginning November 2016. FAC ¶ 31. Also under the Program, on

July 14, 2016, the State recorded a lien on Plaintiffs' property to secure eventual repayment of

the property taxes paid by the State for Plaintiffs. FAC ¶ 34. Under the Program, the deferred

property taxes need not be repaid until "[t]he ownership of the property changes," "[t]he deferral

applicant[s] die[]," or "[t]he deferral applicant[s] move[] from the property for any reason other

than health reasons." FAC ¶ 30. To remain in the Program, Plaintiffs need only certify every two

year that they continue to meet all eligibility requirements. FAC ¶ 59.

On November 1, 2016, Plaintiffs applied for a loan modification under the Home

Affordable Modification Program ("HAMP"). FAC ¶ 41. Plaintiffs' loan modification

application included a copy of their property tax deferral approval letter. FAC ¶ 41.

On November 7, 2016, Plaintiffs and their attorney met with a representative of SLS,

who informed Plaintiffs that they could make trial-period modification payments in the monthly

amount of $2,105.83. FAC ¶ 44. This payment would include an escrow for one-twelfth of

Plaintiffs' anticipated annual property taxes. FAC ¶ 44. The inclusion of the escrow for property

taxes would make their monthly payments higher by $376.68 than it would otherwise have been.

FAC ¶ 44. At that meeting, Plaintiffs' attorney requested that SLS not require as part of

Plaintiffs' trial-period payments any amount for an escrow of property taxes. FAC ¶ 45 At the

meeting, SLS refused to grant the request. FAC ¶ 46. Instead, SLS stated at the meeting that if

Plaintiffs made all three payments under the trial-period modification, SLS would reanalyze the

escrow account for Plaintiffs' loan. FAC ¶ 47. SLS's representation that it would reanalyze the

escrow account led Plaintiffs to believe that after the trial period, an escrow for property taxes

would no longer be included in Plaintiffs' loan. FAC ¶ 47. Plaintiffs made their first trial period

payment on November 30, 2016. FAC ¶ 48.

On January 20, 2017, Mr. Marquard sent Shellpoint, SLS's successor loan servicer,

another copy of the State of Oregon Property Tax Deferral Application Approval along with a

statement. FAC ¶ 51. On February 1, 2017, Plaintiffs paid their final trial period payment. FAC

¶ 43. On that date, they also sent Shellpoint a notice of error under RESPA, which prohibits

servicers from escrowing amounts for property taxes unless they are "reasonably anticipated to

be paid on dates during the ensuing twelve months[.]" FAC ¶¶ 54-53.

Shellpoint responded on February 20, 2017, stating that "[w]e do not have information

from the state of Oregon advising that your property taxes will be temporarily paid for by

another entity or that your taxes are not due for 2017." FAC ¶ 56. On February 27, Plaintiffs'

attorney provided to Shellpoint copies of the letter from the Oregon Department of Revenue

confirming Plaintiffs' participation in the Oregon Tax Deferral Program. FAC ¶ 62. On March 1,

2017, Plaintiffs sent a complaint to the Consumer Financial Protection Bureau. Shellpoint

responded "[b]ecause the tax deferral program does not eliminate the borrower's liability for the payment of the property tax, we must continue to escrow for the property taxes and disburse payments to your taxing authority accordingly." FAC ¶ 64. Shellpoint sent a similar letter to Plaintiffs' counsel. FAC ¶ 65.

On or about March 14, 2017, Plaintiffs signed a permanent HAMP Agreement. FAC ¶ 72. The HAMP Agreement includes monthly escrow payments of 1/12 of Plaintiffs' annual property tax bill plus a 10 percent cushion. FAC ¶ 72. Plaintiffs' monthly mortgage payment constitutes more than 80 percent of the income they receive from the Social Security Administration. FAC ¶ 82. Plaintiffs have continued to pay the monthly escrow payments, under protest, out of fear of foreclosure. FAC ¶ 73.

Plaintiffs fear that, due to their financial situation, they will fall behind again, default on their loan, risk losing their home, and end up homeless. FAC ¶ 82. As a result of this fear, Ms. Marquard has suffered severe emotional distress, including but not limited to anxiety, depression, nausea, headaches, anger, irritability, and sleeplessness. FAC ¶ 75. Mr. Marquard has suffered and will likely continue to suffer severe emotional distress, depression, headaches, anger, irritability, and sleeplessness. FAC ¶ 76. As a further result, Mr. Marquard grinds his teeth during his sleep, leading to headaches, hearing loss, and trouble eating. FAC ¶ 76. His teeth-grinding also has forced him to seek treatment from a physical therapist and will require that he obtain special dental care. FAC ¶ 76. On May 31, 2017, the Court granted Plaintiffs' motion for a preliminary injunction, enjoining Shellpoint from collecting the escrow payments for anticipated property taxes. FAC ¶ 81.

After issuance of the preliminary injunction, Plaintiffs noticed that the terms of their loan modification agreement were not what they thought they had agreed to. FAC ¶ 83. The loan

modification agreement that they signed accounts for an interest bearing principal of $435,850.00, on which Plaintiffs were required to make monthly payments, and a deferred principal balance of $64,226.82, on which Plaintiffs were not required to make monthly payments. FAC ¶ 86. Under the signed agreement, Plaintiffs are to make monthly principal and interest payments of $1,560.28 at three percent interest over a repayment term of 362 months. FAC ¶ 91. Under these terms, Plaintiffs will owe two balloon payments on May 1, 2047: one of $159,664.60 on the balance of the interest bearing principal, and one of $64,226.82 on the deferred interest principal. FAC ¶ 91. The signed agreement contains no explicit reference to a balloon payment of $159.664.60, but does state that for mortgages that do not fully amortize over the term of the note, "there is a final remaining balance that is due upon maturity." ECF 41-2 at 2 (HAMP mortgage modification summary).

Plaintiffs agree with all terms of the signed agreement, except the repayment period and the resulting balloon payment on the interest bearing principal. FAC ¶¶ 84-87. Plaintiffs allege that "[t]he parties intended and agreed" to a repayment term of 480 months, with a maturity date of March 1, 2057. FAC ¶¶ 84-85. Under such an agreement, Plaintiffs would owe only one balloon payment on March 1, 2057: the deferred interest principal of $64,226.82. FAC ¶ 92. By March 1, 2057 (the completion of the 480 month term), the interest bearing principal would have completely amortized and only the deferred interest principal would remain. FAC ¶ 90.

Plaintiffs allege that all parties understood that they had agreed to the longer repayment term, FAC ¶ 95, and the shorter term in the signed agreement was a result drafting error, FAC ¶ 107. Plaintiffs allege that the terms of the modification were subject to HAMP Tier 2, which requires that loan servicers extend the note term to 480 months. FAC ¶ 103; ECF 41-3 at 2 ("HAMP Handbook" ¶ 6.3.2.3). The HAMP Handbook states that servicers may not adjust the

HAMP Tier 2 mortgage adjustment requirements, unless "an investor restriction or applicable law requires them to do so." ECF 41-3 at 2 (HAMP Handbook ¶ 6.3.2). Alternatively, Plaintiffs allege that Defendants unilaterally and intentionally shortened the repayment term in the signed agreement and added the balloon payment, despite neither party agreeing to the shorter term or balloon payment. FAC ¶ 109.

## DISCUSSION

### A. Request for Judicial Notice

On June 30, 2017, Defendants filed a request for judicial notice of three documents:

> **Exhibit A**: Deed of Trust recorded on February 7, 2017 in the Multnomah County Clerk's office (ECF 41-1);
>
> **Exhibit B**: Pages 21-28 of Exhibit 18-8 filed in support of the Declaration of David L. Koen on April 28, 2017 in the pending lawsuit (ECF 41-2);
>
> **Exhibit C**: Making Home Affordable Handbook for Servicers of Non-GSE Mortgages, version 5.1, at 6.3.2, p. 111, (ECF 41-3).

ECF 41 at 2.

Although district courts generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, they may take judicial notice of documents referenced in the complaint, pleadings from other relevant proceedings, as well as matters in the public record, without converting a motion to dismiss into one for summary judgment a motion. *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). Importantly, the Ninth Circuit has "extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

Plaintiffs do not object to judicial notice of Exhibits A and C, and both documents are referenced in Plaintiffs' first amended complaint. Plaintiffs do object to judicial notice of Exhibit B, which includes the cover letter attached to Plaintiffs' loan modification agreement and an unsigned copy of the modification agreement. Defendants argue that the Court may take judicial notice of Exhibit B because it was filed in this lawsuit in support of Plaintiffs' Motion for Preliminary Injunction, and a court may take judicial notice of public records under Rule 201. Plaintiffs correctly respond that, generally, a court may take judicial notice of the fact that a given document was *filed*, but not "of facts presented in those documents . . . for the purpose of establishing those facts in the case currently before it." *Reynoso v. Fid. Nat'l Title Ins. Co.*, 2013 WL 6919666, at *5 (D. Or. Dec. 31, 2013) (refusing to take judicial notice of the factual assertions made in a complaint as a way of establishing essential facts in the case (citing *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003))).

In this case, however, Defendants request judicial notice of a document that Plaintiffs themselves filed in support of their motion for preliminary injunction. *See* ECF 18-8 at 21-25. Plaintiffs have therefore already vouched for the authenticity of both the modification agreement and the accompanying cover letter. Moreover, Plaintiffs reference the modification agreement in their first amended complaint. *See* FAC ¶ 87. Because Plaintiffs referenced the modification agreement in their first amended complaint and have already vouched for the authenticity of both documents by filing them as evidence in support of Plaintiffs' motion for preliminary injunction, the Court will take judicial notice of Exhibit B. Defendants' request for judicial notice of Exhibits A, B, and C is granted.

**B. Motion to Dismiss**

    **1. Conversion**

Plaintiffs claim that by collecting and retaining escrow amounts for Plaintiffs' property taxes which at the time were not owed, Defendants have committed the tort of conversion. Defendants move to dismiss on the grounds that Plaintiffs made the escrow payments voluntarily and any excess funds would be returned at the end of the year.

Oregon follows the definition of conversion set forth in the *Restatement (Second) of Torts* § 222A (1965). *Scott v. Jackson Cty.*, 244 Or. App. 484, 499 (2011) (citing *Mustola v. Toddy*, 253 Or. 658, 664 (1969)). Thus, to state a claim for conversion, a plaintiff must allege facts establishing "the intentional exercise of dominion or control over a chattel that so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel." *Emmert v. No Problem Harry*, Inc., 222 Or. App. 151, 159-60 (2008). The principle concern in a conversion claim is whether the defendant exercised intentional control over the chattel in a manner "inconsistent[] with the plaintiff's rights" *Naas v. Lucas*, 86 Or. App. 406, 409 (1987) (citing *Lee v. Wood Prods. Credit Union*, 275 Or. 445 (1976)). "For the purposes of a conversion claim, money can be chattel." *Cron v. Zimmer*, 255 Or. App. 114, 129 (2013) (citing *In re Martin*, 328 Or. 177, 184 n. 1 (1998)). Thus, Plaintiffs must allege facts sufficient to establish that: (1) Plaintiffs are entitled to control the funds at issue; (2) Defendants have intentionally exercised dominion or control over those funds; and (3) Defendants' control over those funds is sufficiently serious to require full repayment.

Plaintiffs allege that after qualifying for the Oregon Tax Deferral Program, they did not owe property taxes that would otherwise have been paid to Multnomah County between November 2016 and November 2017. Plaintiffs further allege that Defendants continued to bill them for those property tax escrow payments and that Plaintiffs made those payments under

protest and out of fear of having their home foreclosed upon. Plaintiffs claim that Defendants kept those payments in an escrow account where Plaintiffs could not access them to apply to immediate needs. Plaintiffs have further alleged that Defendants have refused to return the funds currently held in escrow. These facts are sufficient to establish that Plaintiffs had a right to control the property tax escrow funds, and Defendant intentionally exercised control over those funds.

Defendants argue that because Plaintiffs made the escrow payments voluntarily, there was no "unlawful assumption of dominion" over Plaintiffs' money. A claim for conversion of money may be barred where the money was voluntarily paid to the alleged converter, or it was otherwise not "wrongfully received." *Talk Radio Network Enters. v. Cumulus Media*, 2016 WL 6693183, at *8 (D. Or. Sept. 13, 2016), *report and recommendation adopted sub nom.* 2016 WL 6699137 (D. Or. Nov. 14, 2016) (quoting *Wood Indus. Corp. v. Rose*, 271 Or. 103, 108 (1975)). A claim may be stated, however, where the converter "was under obligation to return the specific money to the party claiming it." *Id.* Here, Plaintiffs have alleged sufficient facts to establish that they were owed the return of the property tax payments, for reasons explained above. Thus, Plaintiffs' claim is not barred, even assuming that the payments were voluntary.[2]

---

[2] Plaintiffs and Defendants both cite to *Lee Tung v. Burkhart*, 59 Or. 194 (1911), in discussing the relevance of the principle that a withholding may constitute a conversion. That case states that a claim for conversion may lie when there was a "withholding of the possession from the plaintiffs, under a claim of right or title inconsistent with that of the plaintiffs." *Id.* at 202. That case, however, predates by nearly 60 years the contemporary formulation of the definition of conversion, as announced in *Mustola v. Toddy*, 253 Or. 658 (1969). The contemporary definition speaks to a defendant's "dominion or control" over chattel and not "claim of right or title." *Id.* at 663-64. *Mustola* in fact cites *Lee Tung* as an example of the antiquated definition. *Id.* at 643, n. 1. *Lee Tung* is thus of little precedential value to the issue of conversion.

Defendants further argue that because RESPA requires that they account to Plaintiffs any excess funds at the end of 2017, no conversion has occurred. That the allegedly improperly collected funds would have been returned at the end of 2017 speaks to the severity of Defendants' interference with Plaintiffs' right to control those funds, but does not bar Plaintiffs' claim. Paragraph 2 of the *Restatement (Second) of Torts* § 222A identifies the following factors for courts to consider when determining whether the severity of the interference rises to the level of conversion:

> (a) the extent and duration of the actor's exercise of dominion or control;
>
> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c) the actor's good faith;
>
> (d) the extent and duration of the resulting interference with the other's right of control;
>
> (e) the harm done to the chattel;
>
> (f) the inconvenience and expense caused to the other.

*Mustola*, 253 Or. at 663 (quoting *Restatement (Second) of Torts* § 222A (1965)). None of these factors presume permanent deprivation. Rather, they speak to the relative extent and duration of the interference, the defendant's good faith, and the "inconvenience and expense" to the plaintiff. *Restatement (Second) of Torts* § 222A. Plaintiffs have alleged that Defendants wrongfully collected escrow payments between November 2016 and May 31 2017, when the Court issued a preliminary injunction. Defendants continue to retain those funds in escrow. Given Plaintiffs' difficult financial position, these facts are sufficient to establish that Defendants' alleged interference with Plaintiffs' right to control their would-be property tax payment was sufficiently severe to state a claim of conversion.

## 2.  Disability Discrimination under ORS § 659A.142(4)

Plaintiffs claim that Defendants violated Oregon law prohibiting discrimination against people with disabilities by failing to make a reasonable modification to their escrow policy. Defendants challenge this claim as to Ms. Marquand, arguing that the statute does not grant her associational standing. Defendants also challenge the claim as to both plaintiffs on two grounds: (1) Defendants are not places of public accommodations and (2) Plaintiffs have not stated facts to establish discrimination on the basis of disability.

### a.  Ms. Marquand's standing

Plaintiffs allege that Defendants are discriminating against Mr. Marquard because of his disability, and against Ms. Marquard because of her association with Mr. Marquard. Defendants argue that of ORS § 659A.885, the provision that establishes standing for violations of ORS § 659A.142, does not provide for associational standing.

Oregon law provides that "[a]ny person claiming to be aggrieved by an unlawful practice specified in subsection (2) of this section may file a civil action in circuit court." ORS § 659A.885. Subsection (2) includes ORS § 659A.142, the anti-discrimination statute that Plaintiffs allege Defendants violated. Plaintiffs point to ORS § 659A.139, which requires that Oregon's disability discrimination laws (ORS § 659.103 to ORS § 659.144) "be construed to the extent possible" consistently with similar provisions in the Americans with Disabilities Act ("ADA"). The ADA contains an explicit associational standing provision. *See* 42 U.S.C. § 12182(b)(1)(E). Defendants respond that the Oregon standing provision (§ 659A.885) is not included in the sequence of sections directed to be interpreted in lockstep with the ADA (§ 659.103 to § 659.144). Further, the Oregon statute does not have a similar associational standing provision.

The Oregon Supreme Court requires that courts ruling on standing "focus on the wording of the particular statute at issue, because standing is not a matter of common law but is, instead, conferred by the legislature." *Vannatta v. Oregon Gov't Ethics Comm'n*, 347 Or. 449, 470 (2009) (quoting *Local No. 290 v. Dept. of Environ. Quality,* 323 Or. 559, 566 (1996)) (quotation marks omitted). When an Oregon statute grants standing to "any person," "the legislature's policy choice regarding standing . . . is unambiguous." *Kellas v. Dep't of Corr.*, 341 Or. 471, 477 (2006). Such a statute "imposes no additional qualifications for standing." *Id.* In other standing contexts, the Oregon Supreme Court has defined "aggrieved" as meaning "something more than just dissatisfied with a result. It is to have an interest in the outcome—an interest beyond that shared with the general public—such as pecuniary or other interest peculiar to the person who claims to be aggrieved. One indication that a person has a sufficient interest in the outcome so as to be "aggrieved" is the recognition of that interest by the legislature by a statute granting standing." *Nw. Med. Labs., Inc. v. Good Samaritan Hosp. & Med. Ctr.*, 309 Or. 262, 268 (1990).

Here, Ms. Marquard plainly meets the "any person" requirement. She therefore has standing so long as she claims to be aggrieved. In other words, she must claim "to have an interest in the outcome . . . beyond that shared with the general public," *Good Samaritan* 309 Or. at 268. Plaintiffs allege that Mr. and Ms. Marquard are co-owners of their home and that they are at risk of losing that home if Defendants continue their allegedly discriminatory conduct. Ms. Marquard would become homeless along with her husband were Plaintiffs to lose their home. Defendants' allegedly discriminatory conduct therefore has a direct and peculiar effect on Ms. Marquard. Plaintiffs further allege that as a result of Defendants' discriminatory conduct, Ms. Marquard is suffering severe emotional distress, including anxiety, depression, nausea, headaches, anger, irritability, and sleeplessness. Accordingly, Ms. Marquard has alleged that she

has an interest in the Defendants' allegedly discriminatory conduct that is "beyond that shared with the general public" and peculiar to her.

Defendants correctly note that ORS § 659A.142 does not explicitly bar discrimination against people based on their association with people with disabilities, whereas the ADA does contain such a provision. The inference, Defendants suggest, is that associational standing was intentionally excluded from the Oregon laws. But the Oregon Supreme Court in *Good Samaritan* indicated that the legislature's statutory recognition of a person's interest is only "one indication" that a person has sufficient interest in the outcome of a case to be "aggrieved," 309 Or. At 268. Moreover, the Oregon anti-discrimination statutes and the ADA differ meaningfully in how their standing and substantive provisions interact. A close comparison of the two suggests that they should be interpreted to grant similarly broad standing. Like Oregon law, the ADA has an independent standing provision, 42 U.S.C. § 12188 ("Enforcement"). Unlike Oregon law, the ADA extends standing not to "any person claiming to be aggrieved," but to "any person who is being subjected to discrimination on the basis of disability." 42 U.S.C. § 12188 (1). The substantive anti-discrimination provision of the ADA then defines discrimination to include discrimination on the basis of association, 42 U.S.C. § 12182(b)(E), which the Oregon substantive provision does not. *See* ORS § 659A.142. Thus, although the ADA has a more detailed description of actions constituting banned discrimination, which includes discrimination on the basis of association, it has a narrower standing provision, which grants standing only to those "subjected to discrimination," 42 U.S.C. § 12188(1). Oregon law, in comparison, does not explicitly bar discrimination on the basis of association, but has a comparatively broad standing provision that includes "any person claiming to be aggrieved" by discrimination. This broad standing provision is consistent with the policy of Oregon's disability discrimination laws, which

is "to guarantee individuals the fullest possible participation in the social and economic life of the state." Based on the Oregon Supreme Court's precedent interpreting standing provisions, the policy of Oregon's disability discrimination laws and a structural analysis of those laws, Ms. Marquard has standing under ORS § 659A.885 to bring a claim as an aggrieved person for Defendants' alleged violation of ORS § 659A.142.

### b. Public Accommodation

Defendants also challenge Plaintiffs' claim for disability discrimination under ORS § 659A.142 on the grounds that Defendants are not places of public accommodation, as defined by ORS § 659A.400. ORS § 659A.142 provides that "[i]t is an unlawful practice for any place of public accommodation, resort or amusement as defined in ORS § 659A.400 . . . to make any distinction, discrimination or restriction because a customer or patron is an individual with a disability." Oregon defines a place of public accommodation as "[a]ny place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." ORS § 659A.400. The statutory definition excludes certain state institutions and "[a]n institution, bona fide club or place of accommodation that is in its nature distinctly private." *Id.* § 659A.400(2)(e).

Defendants' argument relies primarily on ORS § 659A.139, the ADA lockstepping provision described above. As defined in 42 U.S.C. § 12181(7), a "place of public accommodation" under the ADA "must be a physical place that is connected to the goods or services being provided." *Blair v. Bank of Am., N.A.*, WL 860411, at *5 (D. Or. Mar. 13, 2012), *aff'd sub nom. Blair v. Bank of Am., NA*, 573 F. App'x 665 (9th Cir. 2014) (citing *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000)). Because "Plaintiffs have not alleged that Defendants' collection of escrow payments . . . is connected to an actual

physical place," Defendants argue, Plaintiffs have failed to allege that Defendants are places of public accommodation.

The parties disagree as to whether ORS § 659A.139, the ADA lockstepping provision, applies to ORS § 659A.400, the "public accommodation" definition. The requirement of ORS § 659.139 explicitly references only §§ 659A.103 through 659A.144. The public accommodations definition, § 659A.400, falls outside of that sequence, but is referenced in § 659A.142, the non-discrimination provision. The text of § 659A.139, however, requires that the identified provisions of the Oregon statute be construed in lockstep with the ADA only "to the extent possible." ORS § 659A.139. Given this limitation, the Court need not resolve the question of whether ORS § 659A.139 applies to ORS § 659A.400. Oregon's statute defining public accommodation is substantially different in both text and structure from that of 42 U.S.C. § 12181(7). Assuming, without finding, that ORS § 659A.139 applies to § 659A.400, it is not possible to construe § 659A.400 "in a manner that is consistent" with 42 U.S.C. § 12181(7).

In *Weyer*, the Ninth Circuit interpreted "places of public accommodation" under Art. III of the ADA to require "some connection between the good or service complained of and the actual physical place." 198 F.3d at 1114. Unlike the Oregon statute, the federal statute does not explicitly define the term "public accommodation." Rather, 42 U.S.C. § 12181(7) puts forth an extensive list of private entities that are considered public accommodations for the purposes of the ADA. That list includes such entities "as an inn, a restaurant, a theater, an auditorium, a bakery, a laundromat, [and] a depot." *Id.* In *Weyer*, the Ninth Circuit observed that all items on the list were "actual, physical places where goods or services are open to the public." *Id.* Therefore, "[t]he principle of *noscitur a sociis* require[d] that the term, 'place of public

accommodation,'" be interpreted to include only those places with a nexus between the service provided and a physical location. *Id.*

Oregon's definition of "public accommodation" in ORS § 659A.400 does not support the same strict reading required by the ADA in 42 U.S.C. § 12181(7). The Oregon statute provides a general definition that on its face is not limited to "actual, physical places." The statute explicitly distinguishes between "places" and "services" and includes both in its definition. ORS § 659A.400(a) ("[a]ny place or service"). Paragraphs (b) and (c) of ORS § 659A.400 reinforce this distinction and inclusion. Paragraph (b) includes in the definition of public accommodation "[a]ny place that is open to the public and owned or maintained by a public body," while paragraph (c) includes "[a]ny service to the public that is provided by a public body." § 659A.400(b)-(c). This structure suggests that both publically and privately owned public accommodations are not limited to those services associated with a physical space.

The legislative history of the Oregon Public Accommodations Act, which this Court may consider, ORS 174.020(1)(b), further supports the broader interpretation of Oregon's law. In *Schwenk v. Boy Scouts of Am.*, 275 Or. 327 (1976) the Oregon Supreme Court observed that the Oregon legislature amended the definition of "public accommodation" to include "services" in 1973. Before 1973, Oregon defined "public accommodations" through a list of places, resembling that of 42 U.S.C. § 12181(7). *See Schwenk*, 275 Or. at 332-33 (citing Oregon Laws 1961, 301, ch. 247, § 1). The Oregon Supreme Court concluded that the Oregon Legislature's purpose behind the 1973 amendment, which resulted in the current definition, was "to prohibit discrimination by business or commercial enterprises which offer goods or services to the public." *Id.* at 334. The Oregon Supreme Court approvingly cited a summary of the effect of the 1973 amendment provided by then Administrator of the Civil Rights Division of the Oregon

Bureau of Labor, who claimed that the broadened definition included "the services of credit, financing mortgages, loans, and insurance as well as hotels, motels, retail sales, etc." *Id.* at 335 (quotation marks omitted).

Plaintiffs allege that both Defendants are companies in the business of making and servicing home loans in Oregon. These facts sufficiently allege that Defendants are commercial enterprises that "offer goods or services to the public."

In their reply brief, Defendants raise for the first time the argument that they are not places of public accommodation because of the "selective and discretionary application processes" for mortgage modifications. Generally, any argument first raised in a reply brief is waived. *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (citing *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 n. 1 (9th Cir. 2009)); *see also United States v. Puerta*, 982 F.2d 1297, 1300 n. 1 (9th Cir. 1992) ("New arguments may not be introduced in a reply brief."). Defendants cite new case law from this district, *Breyer v. Pac. Univ.*, 2017 WL 3429395 (D. Or. Aug. 9, 2017), in support of their new argument. *Breyer*, however, does not reflect a change in Oregon state law, as it relies upon closely analogous case law that pre-exists Defendants' opening motion to dismiss. *Breyer*, 2017 WL 3429395 at *3-4 (citing *Vejo v. Portland Public Sch.*, 204 F. Supp. 3d 1149, 1167 (D. Or. 2016) and *Abukhalaf v. Morrison Child & Family Services*, 2009 WL 4067274, at *6-7 (D. Or. Nov. 20, 2009)). Because this argument was first raised in a reply brief and is not based on new or changed law, it is waived.

### c. Discrimination

Defendants argue that Plaintiffs' disability discrimination claim fails because Plaintiffs have not identified any good or service offered by Defendants that Defendants have not made accessible. Plaintiffs respond that Defendants must make a reasonable modification to their

policy requiring escrow payments in order for Plaintiffs to avail themselves of Defendants' loan services.

Both the ADA and Oregon's anti-discrimination laws require that places of public accommodations make reasonable modifications to ensure access to their goods and services by those with disabilities. *See* 42 U.S.C.A. § 12182(2)(A) ("discrimination includes . . . a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities"); Or. Admin. R. 839-006-0330 ("Places of public accommodation must remove physical and administrative barriers, if readily achievable . . . in order to make offered goods and services accessible"). Oregon's anti-discrimination provision, ORS § 659A.142, "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act." ORS § 659A.139(1).

The ADA requirement that places of public accommodation make reasonable modifications to their policies also requires reasonable concessions to ensure that disabled people can fully realize other benefits designed to promote accessibility. The Ninth Circuit held in *Fortyune v. Am. Multi-Cinema, Inc.* that the ADA required a movie theater to remove a non-companion from a companion's seat so that a quadriplegic patron's companion could sit next to him at the theater. 364 F.3d 1075, 1086 (9th Cir. 2004). The Ninth Circuit held that "[s]uch concessions, while certainly 'preferential' in the sense that they confer upon disabled patrons a benefit denied to others, are not only contemplated by the ADA, they are required." *Id.* In order for disabled patrons to fully realize their entitlement to a specially designated area for their wheelchair, they must be extended the additional concession of a companion seat. Similarly, when a person with a disability is entitled to a state benefit intended to promote accessibility or

otherwise ameliorate hurdles faced by people with disabilities, businesses must make reasonable concessions to ensure the realization of that benefit.

Here, Plaintiffs state that they are entitled to property tax deferment due to Mr. Marquard's disability. They allege that the tax relief program is intended to keep the elderly and disabled in their homes, and that it improves Plaintiffs ability to pay, and therefore access, the mortgage serviced by Defendants. Plaintiffs allege that Defendants refuse to give effect to that benefit by continuing to collect escrow amounts that include payments designated for property taxes. Plaintiffs further allege that Defendants' refusal to relax their policy of collecting property tax escrow payments poses an administrative barrier to Plaintiffs' access to Defendants' mortgage services because of the unnecessary financial burden. Plaintiffs have therefore stated a claim that Defendants' policy interferes with a benefit to which Plaintiffs are entitled due to Mr. Marquard's disability and that the interference with that benefit poses a barrier to Plaintiffs' access to Defendants' services.

### 3. The FHA Claim

Plaintiffs allege that Defendants' refusal to stop collecting the escrow payments discriminated against Mr. Marquard as a person with disabilities, in violation of the FHA. Plaintiffs allege that both Mr. and Ms. Marquard have been harmed under the FHA as a result of Defendants' discriminatory conduct. Defendants first argue that Plaintiffs' FHA claim fails as to Ms. Marquard because Plaintiffs do not allege that she has a disability as defined by FHA, and she therefore lacks standing.

Standing to bring a FHA claim is very broad, constrained only by Article III of the U.S. Constitution. *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). A plaintiff need not be the victim of the discrimination complained of, but must have suffered some "distinct and palpable injury" from the discriminatory conduct. *Id.*; *San Pedro Hotel Co. v. City of L.A.*, 159 F.3d 470,

475 (9th Cir. 1998). For example, plaintiffs who witnessed instances of assault and suffered emotional disturbances have standing. *Fair Housing Council v. Penasquitos Casablanca Owner's Ass'n*, 381 F. App'x 674, 676 (9th Cir. 2010).

Plaintiffs allege that they are co-owners of their home and that they are at risk of losing that home if Defendants continue their allegedly discriminatory conduct. Ms. Marquard would become homeless along with her husband were Plaintiffs to lose their home. Plaintiffs further allege that as a result of Defendants' discriminatory conduct, Ms. Marquard is suffering severe emotional distress, including anxiety, depression, nausea, headaches, anger, irritability, and sleeplessness. Accordingly, Ms. Marquard has alleged that she is suffering a distinct and plapable injury from Defendants' alleged discriminatory behavior.

Defendants also challenge Plaintiffs' FHA claim on three additional grounds: (1) Plaintiffs do not allege that 42 U.S.C. § 3605 applies to loan servicing; (2) Plaintiffs fail to allege a disparate impact on a protected group; and (3) Plaintiffs do not allege facts identifying a specific and clearly delineated policy adopted by Defendants. With respect to Defendants' first argument, Plaintiffs sufficiently allege that the FHA applies to loan servicing. In paragraph 181 of the FAC, Plaintiffs quote 24 C.F.R. § 100.130(b)(3) (the implementing regulation of 42 U.S.C. § 3605), which provides that unlawful conduct includes "[s]ervicing of loans or other financial assistance with respect to dwellings in a manner that discriminates . . . because of . . . handicap." *See also Paschal v. Flagstar Bank*, 295 F.3d 565, 569 (6th Cir. 2002) (applying 42 U.S.C. § 3605 and 24 C.F.R. § 100.130 to mortgage servicers).

With respect to Defendants' second and third arguments, the Court notes that the Ninth Circuit has instructed that the "threshold for pleading discrimination claims under the [FHA] is low." *McGary v. City of Portland*, 386 F.3d 1259, 1262 (9th Cir. 2009). In *McGary*, the Ninth

Circuit reiterated that it has explicitly applied the pleading requirements stated in the Supreme

Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002), to FHA

claims. *McGary*, 386 F.3d at 1262 (citing *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49

(9th Cir. 1997)). In *Gilligan*, the Ninth Circuit held that for claims alleging violations of the FHA

there is a "powerful presumption against rejecting pleadings for failure to state a claim." 108

F.3d at 249 (quotation marks and citation omitted). Finally, the Supreme Court has recognized

the FHA's "broad and inclusive compass" and has instructed courts to accord a "generous

construction to the Act's complaint-filing provision." *City of Edmonds v. Oxford House, Inc.*,

514 U.S. 725, 731 (1995). Additionally, the Ninth Circuit recognizes disparate impact claims

under the FHA. *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988). To prevail on a disparate

impact claim, a plaintiff must show "a significant disparate impact on a protected class caused by

a specific, identified . . . practice or selection criterion." *Stout v. Potter*, 276 F.3d 1118, 1121 (9th

Cir. 2002); *Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2.d 922, 927 (N.D. Cal.

2008).

In response to Plaintiffs' request for a modification to Defendants' escrowing policy,

Shellpoint responded: "Because the tax deferral program does not eliminate the borrower's

liability for the payment of the property tax, we must continue to escrow for the property taxes

and disburse payments to your taxing authority accordingly." FAC ¶ 64. Because the Oregon

Property Tax Deferral for Disabled and Senior Citizens Program is a tax *deferral* program, no

participants have their tax liability eliminated, only deferred. Thus, it is reasonable to infer that

Shellpoint's stated policy is to continue to escrow property taxes from all participants in the

Program.

Plaintiffs allege that participants in the Program are all low income and either disabled or elderly. Plaintiffs add that many of the elderly may also have disabilities. Thus, Plaintiffs plausibly have alleged that many, and perhaps most, participants in the tax deferral program are in a protected class as people with disabilities. Plaintiffs also allege that Defendants' policy of escrowing property tax amounts that Plaintiffs do not owe due to disability puts Plaintiffs at risk of losing their home. It is plausible that this risk applies equally to the other participants with disabilities in the tax deferral program, all of whom are low income and all of whom owe property taxes. Given the Ninth Circuit's low threshold for pleading discrimination claims, these facts are sufficient to state a claim that Defendants' escrowing policy has a disproportionate impact on people with disabilities.

### 4. Housing Discrimination under ORS § 659A.145

Plaintiffs allege that Defendants violated Oregon's fair housing law, ORS § 659A.145, by failing to make a reasonable accommodation in their escrowing policy, which deprived Plaintiffs of an equal opportunity to use and enjoy their home. Defendants challenge this claim on the grounds that Plaintiffs have not established that Defendants' collection of property taxes has interfered with Plaintiffs use and enjoyment of their property because "foreclosure proceedings have not been instituted."

Oregon fair housing law requires reasonable accommodations in "rules, policies, practices or services" to be made where such accommodations may be necessary to ensure a disabled person's "equal opportunity to use and enjoy a dwelling." ORS § 659A.145. Oregon's fair housing law mirrors the federal law. *Fishing Rock Owner's Ass'n, Inc. v. Roberts*, 6 F. Supp. 3d 1132, 1138 (D. Or. 2014) (interpreting 42 U.S.C. § 3604 and ORS § 659A.145 identically). The Ninth Circuit requires plaintiffs making reasonable accommodations claims under 42 U.S.C. § 3604 to show that (1) they suffer from a disability as defined by the FHA (here, the Court looks

to the definition in ORS § 659A.145); (2) defendants knew or reasonably should have known of plaintiffs' disability; (3) accommodation of the disability may be necessary to afford plaintiffs an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such an accommodation. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003).

Defendants argue that Plaintiffs do not and cannot meet element three. Defendants contend that Plaintiffs have not claimed any interference with Plaintiffs' opportunity to use and enjoy the dwelling because Defendants have not initiated foreclosure proceedings. Plaintiffs allege that their current mortgage payments constitute more than 80 percent of their income and they are at risk of defaulting. They claim that a default may lead to foreclosure and homelessness. They further allege that the stress of their financial position has caused both Plaintiffs to experience severe emotional distress. The symptoms of this stress include depression, anger, headaches, irritability and sleeplessness. These facts are sufficient to establish Defendants' escrowing of property taxes, and the resulting financial stress, has limited Plaintiffs' opportunity to "use and enjoy" their home.

Defendants further argue that any accommodation would not ameliorate the effects of Mr. Marquard's disability, but only "the effects of Plaintiffs' financial condition." The Ninth Circuit does not draw such a distinction. The court has held that a reasonable accommodation may be made not only for immediate manifestations of a person's physical or mental impairment, but also for the "practical impact" of that disability, to include financial barriers. *Giebeler*, 343 F.3d at 1144 (citing *U.S. Airways v. Barnett*, 535 U.S. 391 (2002)). In *Giebeler*, a plaintiff whose disability prevented him from working was deemed financially unqualified to live in the defendant's apartment complex. *Id.* The plaintiff's mother, who was financially qualified, offered to rent the apartment on behalf of her son. *Id.* The defendant refused her offer,

citing a management policy against cosigners. The Ninth Circuit held that such a refusal was a failure to accommodate under 42 U.S.C. § 3604. *Id.* at 1150-51. In the Ninth Circuit, "even when a neutral policy's adverse effect on disabled persons is attributable to financial limitations faced by disabled persons in securing housing, the FHAA may require an exception to the policy as a reasonable accommodation." *Id.* at 1152.

Plaintiffs allege facts analogous to those in *Giebler*. The State of Oregon offered financial assistance on the basis of Mr. Marquard's disability, and Defendants refused to accommodate that assistance. Under *Giebler*, these facts are sufficient to state a claim for failure to accommodate under ORS § 659A.145.

### 5. Reformation and Declaratory Judgment

Plaintiffs allege that the mortgage modification agreement that they signed with Shellpoint is mistaken as to the repayment term and resulting balloon payment. The modification agreement that they signed establishes a repayment term of 362 months and a maturity date of May 1, 2047. Plaintiffs allege that before signing those documents they had intended and agreed to a repayment term of 480 months and a maturity date of March 1, 2057. The shorter repayment term, Plaintiffs allege, will result in an unintended balloon payment of the remaining interest-bearing principle, $159,664.60, coming due on May 1, 2047. Plaintiffs seek a declaration that the parties' loan modification agreement be interpreted as agreeing to a repayment term of 480 months. Alternatively, they seek reformation of the agreement.

#### a. Declaratory Judgment

Defendants challenge Plaintiffs' request for declaratory judgment on the grounds that it is duplicative of their request for reformation. Oregon's Uniform Declaratory Judgment Act, ORS Chapter 28, authorizes courts "within their respective jurisdictions . . . to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." ORS § 28.010.

The statute specifically allows determination of "any question of construction or validity" arising under written contracts, either before or after there has been a breach of the contract. ORS §§ 28.020-030; s*ee also Walker v. Metro. Life Ins. Co*., 2008 WL 747105, at *2 (D. Or. Mar. 17, 2008). Defendants cite no Oregon case for the proposition that a plaintiff cannot seek a declaratory judgment in the alternative to reformation of a contract. Further, such an argument runs counter to Oregon's statutory text: "No action or proceeding shall be open to objection on the ground that a declaratory judgment is prayed for." ORS § 28-010. Moreover, "a plaintiff is generally entitled to plead alternative or multiple theories of recovery on the basis of the same conduct on the part of the defendant." *MB Fin. Grp., Inc. v. U.S. Postal Serv.*, 545 F.3d 814, 819 (9th Cir. 2008).

### b. Reformation

To state a claim for contract reformation under Oregon law, Plaintiffs must plead that: (1) there was an antecedent agreement to which the contract can be reformed; (2) there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) the party seeking reformation was not guilty of gross negligence. *5 Star, Inc. v. Atl. Cas. Ins. Co.*, 269 Or. App. 51, 60 (2015). Any prior agreement need not be legally binding. *Pioneer Res., LLC v. D.R. Johnson Lumber Co.*, 187 Or. App. 341, 367-78 (2003). The parties must, however, "have previously reached a complete mutual understanding with respect to all of the essential terms of their agreement." *Manning Lumber Co. v. Voget*, 188 Or. 486, 500 (1950).

Plaintiff's primary theory is based on allegations of mutual mistake and that the shorter repayment term was the result of scrivener's error. To establish the existence of an antecedent agreement, Plaintiffs allege that "the parties intended and agreed" that Plaintiffs would make 480 monthly payments and that the maturity date would be March 1, 2057. They also allege other

purported essential terms of that agreement: the date of the first payment (April 1, 2017); the interest-bearing principal ($435,850.00); and the non-interest bearing, deferred principal ($64,226.82) and the annual interest rate (three percent). Plaintiffs point out that their monthly payments at the stated interest rate would amortize to their interest-bearing principal in 480 months, not 362. They also allege that their mortgage modification was performed pursuant to the provisions of Home Affordable Modification Program Tier 2, which require modified loans to be re-amortized to 480 months.

Plaintiffs do not allege, however, when or how the alleged antecedent agreement was established. They make no claims about how they came to their understanding of the terms of their mortgage modification before receiving the purportedly mistaken modification documentation that they signed. They also allege no facts about the existence of a specific communication (oral or written) in which SLS indicated that the amortization term would be 480 months. In the absence of facts indicating some communication between the parties relating to the prior agreement, Plaintiffs have failed to plausibly claim the "complete mutual understanding" necessary to establish an antecedent agreement.

Given that Plaintiffs have not alleged facts sufficient to establish the existence of an antecedent modification agreement, they have also not alleged facts sufficient to establish mutual mistake regarding the terms of the purported agreement. Plaintiffs allege that the 362-month term in the signed agreement was scrivener's error. But there must have been some antecedent agreement in order for it to have been improperly transcribed on the modification documents.

Plaintiffs' alternative theory is that they were unilaterally mistaken and Defendants engaged in inequitable conduct. Both theories require the existence of an antecedent agreement, though there need not have been a "complete and mutual understanding" as to the antecedent

agreement under a theory of unilateral mistake if the defendants engaged in inequitable conduct. "[T]he range of misconduct termed 'inequitable' is quite broad, varying from the most egregious and concrete, such as fraud, to more amorphous and somewhat less egregious misconduct, sometimes described as 'overreaching' or 'sharp practice.'" *Murray v. Laugsand*, 179 Or.App. 291, 302 (2002). Inequitable conduct includes a party's silence where that "party knows that the other party is materially mistaken as to a writing's scope and effect, but remains silent, hoping to take advantage of the other's mistake." *Pioneer Resources*, 187 Or.App. at 376, 68 P.3d 233.

As noted above, Plaintiffs have failed to allege even their own unilateral mistake in more than conclusory terms. They do not allege facts that explain how they came to the understanding that their repayment term would be 480 months. They have thus not alleged that an antecedent agreement existed; further they have not alleged sufficient facts to establish their unilateral mistake as to that agreement. Moreover, they do not allege any specific inequitable conduct on Defendants' part that would have misled Plaintiffs about the terms of the signed agreement. Nor do they allege facts indicating that Defendants knew about Plaintiffs' mistaken understanding, but remained silent. Plaintiffs do allege that Defendants will receive a windfall by reporting their compliance with Hamp Tier 2 to the United States Treasury when they are not actually compliant with that program. Such inequitable conduct, however, is not "overreaching" or "sharp practice" as it relates to the Plaintiffs' mistake as to the terms of their contract. Because the existence of an antecedent agreement to which the contract could be reformed has not been established, the claim for reformation fails under both of Plaintiffs' theories. Plaintiffs have leave to replead.

## CONCLUSION

Defendants' Request for Judicial Notice (ECF 41) is GRANTED. Defendants' Motion to Dismiss (ECF 40) is GRANTED IN PART and DENIED IN PART. Defendants' motion is granted with respect to Plaintiffs' claim for reformation of the mortgage modification agreement.

Plaintiffs may amend their complaint within 14 days to cure the deficiencies identified in this

Opinion and Order. Defendants' motion is denied in all other respects.

**IT IS SO ORDERED**.

DATED this 22nd day of September, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge